250 S.W.2d 159 (1952)
OSBORNE
v.
PURDOME.
No. 42964.
Supreme Court of Missouri, en Banc.
June 9, 1952.
Rehearing Denied July 14, 1952.
Wm. Orr Sawyers, St. Joseph, Delton L. Houtchens, Clinton, Ira B. McLaughlin, Kansas City, for petitioner.
Lawrence R. Brown, Kenneth I. Fligg, David R. Hardy, Kansas City, amici curiae, for respondent, Henry H. Fox, Jr., Pros. Atty. of Jackson County, Kansas City, of counsel.
*160 HYDE, Judge.
Petitioner in habeas corpus, Alfred H. Osborne, was adjudged guilty of criminal contempt in the Circuit Court of Jackson County and sentenced to imprisonment in the county jail for ten months and to pay a fine of $1,000.
The complaint alleged that petitioner through Matt Jones, a janitor at the courthouse, attempted to corrupt a juror, Verna E. McDonald, in the case of Luella Hicks v. Kansas City Public Service Company, in which he represented the plaintiff. The complaint alleged and there was substantial evidence to show that petitioner talked to Jones during a noon recess in the case and that, thereafter, Jones talked to Mrs. McDonald about influencing the verdict in favor of petitioner's client. Jones also pointed out petitioner to Mrs. McDonald and told her he was his boss; and he later said: "if you be nice to him (petitioner) why he'd be nice to you * * * if you will try to arrange it so you will favor the jurors by telling them to change their verdict, why, everything will be all right. I will come over to your house * * * and make everything right with you." Mrs. McDonald told the foreman of the jury about this when the jury retired to consider their verdict. The foreman informed the Court about it, and, after verdict was returned for defendant, the Court heard evidence about it on the next morning, Saturday, March 31, 1951. Thereafter, on April 6, 1951, Matt Jones was found guilty of contempt and the contempt proceeding against petitioner was commenced.
Petitioner's first contention is that the complaint was insufficient to vest the Court with jurisdiction of the subject matter thereof and, therefore, the judgment and commitment are void. Petitioner's argument is that such a proceeding is instituted for and on behalf of the State and can only be done by the Attorney General or a prosecuting or circuit attorney. The basis of this and some of petitioner's other assignments is that criminal contempt is a criminal case in which he is charged with a specific crime and must be tried as such. Petitioner made the same contention about the character of the proceeding in Osborne v. Purdome, Mo.Sup., 244 S.W.2d 1005, in which we fully discussed the matter and decided that he was wrong about it. We reaffirm what we there ruled, namely: "Contempt proceedings are not criminal cases within the meaning of the Constitution, statutes and case law of Missouri." The complaint in this case was prepared and signed by three attorneys appointed by the Court and designated amici curiae. It was sworn to by Matt Jones. A similar contention was recently made in Melvin v. State, 210 Miss. 132, 48 So.2d 856, 860, 49 So.2d 837, in which the Court said: "Appellants say that the court had no authority to appoint the three attorneys to prepare and execute the information, this unprecedented action was improper, and that the court should have called upon the district attorney to file the charges. However, attorneys are officers of the court and take a solemn oath to uphold the administration of justice. Mississippi Code of 1942, Section 8664; Ex parte Redmond, 120 Miss. 536, 82 So. 513. We see no reason why the court should be denied the power to call upon its own officers to assist it. Otherwise, the judge himself would have to get out and make the investigation." See also Bridges v. Superior Court of Los Angeles County, 14 Cal.2d 464, 94 P.2d 983; Regina v. Ellis, (Ex parte Baird) 28 N.B. 497, 6 Trueman 497, loc. cit. 519; 13 C.J. 60, Sec. 82, 17 C.J.S., Contempt, § 63, p. 80. In State ex rel. Gentry v. Becker, 351 Mo. 769, 174 S.W.2d 181, 184, we held that a court could make such an appointment, saying: "The court has the inherent power to punish for contempt and if it has also the inherent power to appoint or request a lawyer, as an officer of the court, to represent it or the state in the prosecution of the contempt proceeding, that is all the power the court reasonably needs for its own protection and for the due administration of justice." We hold that the procedure followed was proper and that the Court had jurisdiction.
Petitioner's next contention is that he was denied due process of law and equal protection of the law in violation of the Fourteenth Amendment to the Constitution of the United States and Sections 2 and 10 of Article 1 of the Constitution of *161 Missouri, by being denied a trial before an unprejudiced judge. As to the overruling of petitioner's motions and affidavits for change of judge, the same matter was raised and decided in Osborne v. Purdome, supra, 244 S.W.2d loc.cit. 1013. We reaffirm the ruling there made that no change of venue lies in a criminal contempt case. We recognize, as there stated, that a judge who cannot give the accused a fair trial should not sit but should call in another judge. However, considering the record in this case as a whole, we are convinced that such a situation did not exist herein. Judge Southern made the statement at the beginning of the case that he had no feeling in his own mind that he could not hear the evidence and apply it without being prejudiced and that he never did decide a case before he heard all the evidence. The record in this case consisting of four volumes of evidence and two volumes of exhibits (1892 pages) shows that Judge Southern acted with great concern for petitioner's rights and permitted the most extended and searching cross-examination of the witnesses by his counsel. As hereinafter shown, we do not see how any court, on this record, could reasonably reach any other conclusion than he did. It was necessary for Judge Southern to find some probable cause for the proceeding before he ordered it commenced and we are convinced from the record that he did no more than that before the trial. We hold there is no merit in this contention.
Petitioner further contends that the testimony of the witnesses, Mrs. McDonald and Irving Curtis Jones, was contradictory, self-destructive and impeached and was of no probative force, and, therefore, there was insufficient evidence to show that petitioner induced Matt Jones to influence the juror. We have set out at the beginning of this opinion the substance of the testimony of Mrs. McDonald. Petitioner argues inconsistencies in her testimony with former statements as to time, exact place and specific wording of her conversations with Matt Jones brought out in the long and extensive cross-examination by his counsel. We think the Court could reasonably have found that these were satisfactorily explained and that there was no substantial variation from the real substance of her testimony. We hold there is no merit to this contention as to her testimony.
Irving Curtis Jones had been indicted for the murder of Matt Jones, who disappeared the night before he was to testify at the hearing in this case set for Monday, July 23, 1951. Indicted with him were Floyd Caesar Smith and Ivory Johnson, alias Ivory Hudson, generally known as Seldom Seen. Irving Jones became acquainted with Seldom Seen when they were both serving sentences in the Missouri Penitentiary and he had worked for him as a lookout in his gambling operations. Irving Jones said that he did not know Matt Jones but that, during the week prior to July 23rd, Seldom Seen told him Matt Jones was going to testify against petitioner in a case and that they wanted Matt "to either get out of town or change the testimony." Seldom Seen got Floyd Smith to drive Irving Jones to a place where he could point out Matt Jones to him, which he did. Their plan was to have Irving Jones bring Matt Jones to a place where Seldom Seen could talk to him. Matt Jones knew Floyd Smith and Seldom Seen and would not talk to them at their request and they had not been able to contact him during that week. Irving Jones also said he saw petitioner talking to Seldom Seen in front of his gambling place on Saturday, July 21st, between 8:00 and 8:30 p. m.
According to the testimony of Irving Jones, the next afternoon he, Floyd Smith and Seldom Seen met petitioner at a building in Leeds, which was the office of Dr. Carl Moore, a friend of petitioner, who had testified in a number of personal injury cases in which petitioner represented the plaintiff. Petitioner had a key and let them in. They talked about a plan for Irving Jones to get Matt Jones, who frequently operated a cab, to drive him to a place where he could meet Floyd Smith and Seldom Seen. Petitioner said "he wanted Seldom to deal with him, for him to get out of town or either change that testimony because if he got to trial to appear against him, why, he was through." He also testified that petitioner said Seldom Seen already *162 had the money to pay Matt Jones; and that Seldom Seen had previously told him that he (Irving Jones) would get a thousand dollars for what he did. That night Floyd Smith drove him around until they located Matt Jones. He got in his cab and asked Matt to take him to 22nd and Forest. Floyd then got Seldom Seen and pulled up behind Matt's cab as it reached this destination. Seldom Seen "threw a gun on him" and forced Matt to enter their car. "Seldom told him to get down on the floor, for him to lay down quiet and he wouldn't get hurt." Floyd was driving and Irving Jones was in the front seat with him. Matt refused money and tried to get up. There was scuffling and blows were struck by Seldom Seen which caused Matt to bleed profusely. Seldom got Matt on the floor again, got a belt from Floyd and strangled Matt to death. Then at Floyd's suggestion they went to see some people he knew in Independence "to get some weights and things" and "he suggested that he should be weighted down and throwed in the river." Floyd got two tire chains and a concrete block and they all washed blood off their hands. They did throw Matt's body in the Missouri River, weighted with the concrete block attached to his ankles with the tire chains. His body was found in the river on July 25, 1951, with the tire chains and concrete block still attached to his ankles.
It is true that Irving Jones was an exconvict but his testimony is corroborated in some respects by other testimony and circumstances. We cannot say it is unbelievable. In view of what the whole record shows about the relations and conduct of petitioner toward Matt Jones, the motive he had in preventing his testimony, and his efforts to get him to change it, we think the Court could reasonably believe the substance of the testimony of Irving Curtis Jones. In this connection, we note the testimony of J. Carl James, an attorney associated with petitioner in other cases, that petitioner told him, on April 6, 1951, "that Matt Jones had spilled the beans or spilled his guts in Judge Southern's Court and mentioned the Burton v. Moulder case, see 244 S.W.2d loc. cit. 1008-1010, and said we'd have to stick together, hang together, or hang separately." There was also much evidence of continuous sustained efforts thereafter, between April and July, to get Matt Jones to change his testimony, which were partially successful. During May and June he did give contradictory statements to lawyers representing others involved in this and the Burton v. Moulder case and to the Advisory Committee of the Bar. However, it is significant that petitioner surrendered his license to practice law after an information was filed against him by the Advisory Committee. See 244 S.W.2d loc. cit. 1016. During this period, a lawyer was employed for Matt Jones and Seldom Seen took money to Mrs. Jones on three separate occasions while Matt was in jail. Seldom Seen also told Mrs. Jones that it was decided that she should leave town, threatened her when she refused, and told her on another occasion he didn't like double crossing. Seldom Seen also attempted to get Henry Fuller, who had been in the penitentiary with him, to aid him in getting Matt Jones back in line and told him it would be worth two thousand dollars or maybe three. It was shown that there were conferences between petitioner and Seldom Seen and others on several occasions during this period. An attempt to fabricate evidence, procure false evidence or destroy evidence is evidence of the main facts charged; such an attempt is construed as being in the nature of an admission of guilt. State v. Christian, Mo.Sup., 245 S.W.2d 895; State v. Smith, 355 Mo. 59, 194 S.W.2d 905. There were many other circumstances shown in the record which fit into the pattern of events stated in the testimony of Irving Curtis Jones and which made it reasonable for the Court to accept it as true. Certainly there was ample evidence to support a finding that petitioner induced the endeavor of Matt Jones to influence the juror.
Petitioner's final contention is that the transcript of the testimony of Matt Jones, at the hearing of his own citation for contempt on April 6, 1951, was inadmissible. He says this violated his constitutional rights because he had no opportunity for cross-examination and he claims it was *163 self-serving hearsay, made in view of pending and threatened litigation for the purpose of avoiding immediate and drastic consequences, and also that it was completely impeached, citing State v. Gorden, 356 Mo. 1010, 204 S.W.2d 713; Moore v. Metropolitan Life Ins. Co., Mo.App., 237 S.W.2d 210; McComb v. Vaughn, 358 Mo. 951, 218 S.W.2d 548; and Tennison v. St. Louis-S. F. R. Co., Mo.Sup., 228 S.W.2d 718. We think the testimony of Matt Jones, on this occasion, that he agreed with petitioner to influence one of the jurors and attempted to do so, was admissible as a declaration against interest under our ruling in Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 284, 162 A.L.R. 437. See Annotation 162 A.L.R. 446. In that case, we ruled that this exception to the hearsay rule extended to a declaration which subjected the maker to criminal liability. In that case, the declaration was in an affidavit admitting that the affiant, at the request of a lawyer for the plaintiff in an automobile collision case, "had engaged in a fraudulent, shameful and criminal conspiracy culminating in perjury consisting of wholly fabricated testimony against a party to whom he was a stranger." Matt Jones, according to his declaration in question, had engaged in just as fraudulent, shameful and criminal conspiracy with petitioner to obtain a false and fraudulent verdict of a jury. See Sections 557.110 and 557.130, RSMo 1949, V.A.M.S. Lack of opportunity for cross-examination is not a question involved when evidence is admissible under an established exception to the hearsay rule. (See 5 Wigmore on Evidence 202, Sec. 1420.) Since Matt Jones was dead there was no question of his availability under the necessity principle discussed in Sutter v. Easterly. Whether or not his testimony was impeached, by later inconsistent statements offered in evidence by petitioner, was a question for the trial court.
Petitioner, however, contends that the declarations were not actually against the interest of Matt Jones because he expected to receive less punishment by making them and that this made them self-serving. Matt Jones did say at the time to Judge Southern: "I thought if I told you the truth you would have mercy on me and wouldn't prosecute me so hard." However, he understood he would be punished and said that no one made threats, promises or offers of reward and that he volunteered to come in and tell the truth. Certainly there is always some motive for making a declaration against interest and the only ones that are rejected are those which are improperly induced. There is no evidence here to contradict the completely voluntary character of these declarations. The theory of admissibility of declarations against interest is that they are trustworthy because the declarant would not concede, even to himself, the existence of a matter contrary to his interest unless he believed it to be true. (See 5 Wigmore on Evidence 262, Sec. 1457; American Law Institute Model Code of Evidence, Rule 509, comment c.) We do not think it is necessarily a question of how much it is against the declarant's interest; if the matter declared has the quality of being directly and immediately against the declarant's interest that should be sufficient. It is clear that, by making these declarations, Matt Jones was subjecting himself to criminal liability and whether the punishment would be greater or less he knew he was admitting a crime and subjecting himself to punishment. Thus this is within the test stated in the Tennison case, 228 S.W.2d loc. cit. 720, that the interest injured " `be one so palpable and positive that it would naturally have been present in the declarant's mind.' " We, therefore, hold this was sufficient to make his statements admissible as declarations against interest.
In any event, this was not a criminal case, Osborne v. Purdome, supra, 244 S.W.2d loc. cit. 1012, where error in admission of evidence in a trial by a jury might require a new trial. Although it is necessary that guilt be established beyond a reasonable doubt in criminal contempt cases, 17 C.J.S., Contempt, § 84 p. 113, nevertheless "the improper admission of evidence, even though material, in a trial before the court without a jury, where record was sufficient to sustain conviction without such evidence", does not require reversal. 17 C.J.S., Contempt, § 125, note 64 p. 170; and cases cited; see also Sinclair v. United *164 States, 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938; Clark v. United States, 8 Cir., 61 F.2d 695; Swepston v. United States, 6 Cir., 251 F. 205. This is because the Court is presumed to act on the admissible evidence and the appellate court could reject inadmissible evidence and proceed to rule the case as if it were not in the record. We need no presumption here because, in this case, the Court specifically found: "The remaining testimony makes a clear case against contemnor, without Matt Jones' testimony, and I so find." From our own review of this record we agree. Certainly there was the strongest kind of circumstantial evidence against petitioner, sufficient to establish his guilt beyond a reasonable doubt, and it convinces us that the result reached was clearly correct.
The writ issued herein is quashed and petitioner remanded to the custody of the Sheriff of Jackson County.
All concur.